# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NICHOLAS J. DEVIZZIO, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:14-386 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Nicholas J. Devizzio ("Devizzio") seeks review under 42 U.S.C. § 405(g) of an adverse decision on his application for disability-based benefits available under the Social Security Act. A reviewing court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). It cannot retry factual issues *de novo* or substitute its interpretation of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can it overturn administrative rulings because it would have reached a different conclusion had the matter come before it in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

Within the penumbra of this limited scope of judicial review, however, lies a threshold duty to determine whether claimants received full hearings in accordance with beneficent purposes of the Social Security Act.[1] Thus, before evaluating the Commissioner's findings and conclusions, reviewing courts first ensure that claimants received full and fair hearings. *See Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *accord Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990). This requires "searching investigations" to ensure that administrative law judges protected claimants' rights. *See Robinson v. Secretary of Health & Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984).

## I. Introduction

This is an unconventional case. Devizzio, born in 1960, applied for *child's* disability insurance benefits in 2011 when he was *fifty-one years old*.[2] He claimed disability commenced November 4, 1962, (when he was two years of age) due to "osteo arthritis, club feet, spinal stenosis, and hip displaced." (T. 172).

While this belated application was not legally time-barred, other pragmatic obstacles were nearly as insuperable. First, Devizzio would need to prove that he became disabled *before* attaining the age of twenty-two, *i.e.*, prior

---

[1]  The Act must be liberally applied, for it is a remedial statute intended to include not exclude. *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)(citing *Bluvband* v. *Heckler*, 730 F.2d 886, 892 (2d Cir. 1984)).

[2]  Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. *See* 42 U.S.C. § 423(a); *see also Mathews v. Castro*, 429 U.S. 181, 186 (1976).

to his birthday in 1982.[3]  It was foreseeable (if not inevitable) that childhood medical records for a man fifty-one years of age no longer would be available.

Second, and because Devizzio applied for child disability insurance benefits after reaching adulthood, his application would be determined under the *same standards as for adults* applying on their own wage records.[4]  Thus, even were Devizzio's early medical records intact, they likely would have little or no forensic value.  *Pediatric* medical records rarely address a child's physical and mental capacities to engage in work activities.  Even when impairment-related functional limitations are recorded, pediatricians and other medical providers usually compare them to normal childhood development and activities, not predicted adult vocational capabilities.

Given these hurdles, reason and common experience would lead one to believe that Devizzio had little chance to prove that while still a toddler he became disabled under adult standards.

## II.  Background

Devizzio, the son of Italian immigrant parents, attended regular education classes, played the violin, rode a bike, socialized with friends, participated in gym class, and graduated from high school.  (T.  54, 57, 69, 80).

---

[3]     A disabled, unmarried child under the age of 22 is entitled to child's disability insurance benefits based on the earnings record of an insured parent who is entitled to old-age or disability benefits or who has died.  *See* 42 U.S.C. §§  402(d), 423(d); *see also* 20 C.F.R. §§ 404.350(a) and 402(d)(1)(G).

[4]     The adult standard applied because Devizzio applied for child's insurance benefits after attaining age 18.  *See* 20 C.F.R. § 416.924(f); *see also* 20 C.F.R. § 404.350(a)(5).  The disability standard for child's benefits sought by an adult is the same as for general disability insurance benefits. *Plumley v. Astrue*, No. 2:09-CV-42,  2010 WL 520271, at *3 (D. Vt. Feb. 9. 2010).

Devizzio was diagnosed with club feet in February, 1961. (T. 532, 579, 582). In July, 1968, he was diagnosed with metatarsus valgus.[5] (T. 531, 577, 578, 580, 581). Treatment notes in February and May 1979 showed his weight/height combination in the obese range and a diagnosis of pes planus (flat feet). (T. 409).

At an early age, he was prescribed a "Dennis Brown bar," *i.e.*, baby shoes with a bar between them, as a nonsurgical method to attempt to correct his club feet. (T. 62, 76, 530-32). He also had a "special stroller" to help position his posture. (T. 63). He had several surgeries in early childhood on his feet, hips, and left knee. (T. 64-65). He retains scars from those surgeries. (T. 64).

Devizzio's height is 5'1." (T. 73). In high school, he weighed around 148 pounds. (T. 73). By age 21, Devizzio's weight was "heading towards 200." (*Id.*). In his early fifties, he weighed approximately 287 pounds. (T. 72).

Devizzio obtained a driver's license, and attended some college. (T. 52, 55). He received vocational training in office and book keeping procedures in 1991. (T. 172). Thereafter, he worked intermittently in various clerical capacities and as a cashier during portions of 1992, 1993, and 2000 through 2007. (T. 173, 178). None of his work was appreciable enough, however, to constitute "substantial gainful activity."[6] (T. 27).

---

[5] A deformity in which the foot is twisted outward. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1145, 2020 (32d ed. 2012).

[6] "Substantial gainful activity" or "SGA" is "work that involves doing significant and productive physical or mental duties" done for pay or profit, and may include part-time work even if it includes less responsibility or pay than work previously performed. 20 C.F.R. §§ 404.1510(a)(b), 404.1572, 416.910(a)(b), 416.972. "Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity." *See* 20 C.F.R. §§ 404.1574, 416.974.

### III. Commissioner's Decision

Devizzio's claim was denied initially, and he requested an evidentiary hearing. His case was assigned to an administrative law judge, Arthur Patane ("ALJ Patane"), who conducted an evidentiary hearing in June, 2012. (T. 41-85). Devizzio, represented by an appointed legal counsel,[7] attended and testified. (*Id*.). A family friend, Jean Ventre, also appeared and testified. (T. 25, 79-84). The remaining sources of evidence included affidavits from family friends, sparse medical records pertaining to the period *prior to 1982*, and additional medical records pertaining to Devizzio's *current* medical condition.

ALJ Patane utilized a five-step evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act.[8] This procedure is sequential, *i.e.,* when a decision can be reached at an early step, remaining steps are not considered.

At Step 1, ALJ Patane found that Devizzio had not attained age 22 as of November 4, 1962, his alleged onset-of-disability date, and that even though he worked sporadically, he never engaged in substantial gainful activity. (T. 27).

At Step 2, ALJ Patane found that Devizzio, prior to attaining age 22, had the following medically determinable impairments: "bilateral club feet; bilateral

---

[7]     Devizzio was represented by a retained counsel until shortly after his claim was initially denied. That counsel withdrew his representation stating that Devizzio "has not cooperated with us and is not responding to our attempts to contact him by telephone and mail." (T. 107). Devizzio subsequently received an appointed representative with the Legal Aid Society of NENY, Inc. (T. 119).

[8]     *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

metastasis (*sic*) valgus;[9] obesity and pes planus (flat feet)." (T. 27). ALJ Patane further found, however, that these impairments were not severe. (*Id.*). Specifically, ALJ Patane found no contemporaneous medical evidence suggesting that Devizzio's impairments significantly limited (or were expected to significantly limit) his ability to perform basic work-related activities for twelve consecutive months. (*Id.*).

Under sequential evaluation, a finding that a claimant lacks a severe impairment ends the inquiry. Thus, ALJ Patane concluded that Devizzio had not been under a disability at any time prior to 1982, and his application was denied in a written decision dated October 15, 2012. (T. 25-33).

The Appeals Council denied Devizzio's request for review. (T. 1-4). Devizzio then instituted this proceeding.

## IV. Points of Alleged Error

Devizzio, now proceeding *pro se*, proffers nearly 200 pages of argument in the forms of a "Plaintiff's Brief" (Dkt. No. 30), "Motion for Summary Judgment" (Dkt. No. 29), "Motion to Submit New Relevant Evidence" (Dkt. No. 28), and "Motion to Striking (*sic*) of Statements" (Dkt. No. 27). Liberally construed, Devizzio proffers five issues:

1. Failure to fully develop the evidentiary record;
2. Denial of due process of law by failing to conduct a supplemental hearing;
3. Decision contrary to the evidence of record;
4. Remand for consideration of new evidence; and
5. Strike portions of the administrative record, ALJ Patane's decision and the Commissioner's Answer.

---

[9] This appears to be a scrivener's error. The correct medical term is "metatarsus valgus."

## V.   Discussion

Pleadings and arguments of *pro se* litigants, even when liberally construed, often prove to be irrelevant and misguided.  Such is this case here because, *as argued*, none of Devizzio's points demonstrate reversible error.

### A.   *Motion To Strike*

The court lacks authority to strike items from ALJ Patane's decision or the certified transcript of administrative proceedings simply because Devizzio disagrees with them.  Nothing in the Commissioner's answer satisfies Rule 12(f), Federal Rules of Civil Procedure, for the striking of pleadings.

### B.   *Failure to Develop Adequate Record*

The fact that ALJ Patane slightly misspelled a physician's name in an administrative subpoena directed to "Community Care Physicians" is inconsequential in view of the fact that the subpoena requested "any and all treatment records."[10]   Likewise, the fact that ALJ Patane did not specifically request *orthopedic* records from another entity named "Community Care Pediatrics" is a moot issue since that entity responded that *all* of its records concerning Devizzio had been destroyed.[11]   Finally, ALJ Patane did not err in failing to obtain treatment records from "the late, Dr. William E. Gazeley," with "Saratoga Public Heath Orthopedic Clinic."  ALJ Patane was unaware of that potential evidence, and he satisfied his legal duty by holding the record open after the hearing, and by relying on Devizzio's counsel's representation that the

---

[10]     The physician's name was " Joseph Mintzer."  ALJ Patane's subpoena asked for records from "Dr. Minter."  (T. 123).

[11]     In response to that subpoena, the office manager of that facility acknowledged that Devizzio was a former patient of Dr. Charles Richman, M.D., "many years ago when he was a child."  (T. 517).  The Office Manger explained, however, that "[h]is medical records, from our office, are no longer available. Due to his age, his records had been destroyed some time ago."  (*Id.*).

record would be fully developed upon receipt of previously-subpoenaed information from the two Community Care entities. *See Jordan v. Commissioner of Soc. Sec.*, 142 Fed. App'x 542, 543 (2d Cir. 2005) (summary order) (finding no failure to develop an adequate record when administrative law judge kept the record open so that counsel could obtain additional records and counsel subsequently advised that the claimant had nothing further to add and did not request assistance in securing additional evidence).

## C.    *Sufficiency of Evidence*

Devizzio invites the court to reweigh evidence and come to a different conclusion than did ALJ Patane. A reviewing court must reject that invitation, as it lacks authority to make *de novo* findings. Moreover, "whether there is substantial evidence supporting the [claimant]'s view is not the question." *Bonet ex rel. T.B. v. Colvin*, 523 Fed. App'x 58, 59 (2d Cir. 2013) (summary order). Rather, the court "must decide whether substantial evidence supports *the ALJ's decision.*" *Id.* (emphasis in original).[12]

## D.    *Denial of Due Process*

ALJ Patane did not deprive Devizzio of his right to "due process of law" by not conducting a supplemental hearing. After receiving a post-hearing response to the evidentiary subpoena issued to "Community Care Physicians,"[13] ALJ Patane notified Devizzio and his counsel of his intention to include that

---

[12]    "Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

[13]    Approximately a month after the administrative hearing, "Community Care Physicians," supplied ALJ Patane with 206 pages of medical records. (T. 583-790).

additional medical evidence in the record, their opportunity to object and their option to request a supplemental hearing if desired. (T. 338-39). No response or request for an additional hearing was made.

## E.   *Remand for New Evidence*

Some of the proffered documents already are in the record and, therefore, are not new, but cumulative. Even if the remaining documents arguably are new and material, Devizzio has not demonstrated good cause for not proffering them earlier. Thus, Devizzio has not satisfied the requirements for having the court remand for consideration of new evidence.[14]

## VI.   Latent and Undetected Error

Documents submitted by Devizzio disclose that in the mid-1990's, when Devizzio was approximately thirty-five, he applied for and was *granted* disability-based supplemental security income benefits.[15] The administrative record concerning that award is not before the court, but one exhibit attached to Devizzio's motion to submit new evidence consists of a letter from the Social Security Administration confirming that Devizzio (a) applied for supplemental security income on 09/25/1995, (b) alleged onset of disability on 01/06/1994, and

---

[14]     The governing statute provides:

The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ....

*See* 42 U.S.C. § 405(g).

[15]     Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line. *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed. 2001).

(c) received his first payment beginning 9/1995. (Docket Entry No. 28-1, p. 2). Devizzio's *pro se* submissions, moreover, make numerous references to his "S.S.I. classification." *See* "Introductory Summary" (Docket Entry No. 30-2, p.1; "Opening Argument" (Docket Entry No. 30-3, pp. 1,9).

Had ALJ Patane perceived or been made aware of Devizzio's existing disability adjudication, he would have known that Devizzio's 2011 application for child's disability insurance benefits was not *sui generis*, but rather a maladroit effort to establish an earlier onset-of-disability date in order to obtain a longer period of potentially larger benefits. In that context, the analytical path would have been illuminated more clearly.

*A.     SSR 83-20*

Through an official ruling,[16] the Commissioner provides guidance for establishing an onset date for individuals already determined to be disabled. *See* SSR 83–20, TITLES II AND XVI: ONSET OF DISABILITY, 1983 WL 31249 (S.S.A. 1983). For disabilities of nontraumatic origin, the ruling acknowledges that "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." SSR 83–20, 1983 WL 31249, at *2. The ruling addresses that conundrum as follows:

> Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are *far in the past* and *adequate medical records are not available*. In such cases, it will be

---

[16]     "Social Security Rulings are . . . binding on all components of the Administration." *Sullivan v. Zebley*, 493 U.S. 521, 531 n. 9 (1990) (quotation marks omitted); see 20 C .F.R. § 402.35(b)(1). While they lack the force of law, and are not binding on courts *ipso jure*, they often are consulted and adopted as expressions of correct legal standards when the statute provides little guidance. *See Connor v. Chater*, 947 F. Supp. 56, 61 (N.D.N.Y. 1996). Thus, courts generally uphold the Commissioner's interpretation as long as it is a permissible interpretation of the Act. *White v. Shalala*, 7 F.3d 296, 300 (2d Cir. 1993) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984)).

necessary to *infer* the onset date from the medical *and other evidence* that describe the *history* and *symptomology* of the disease process.

*Id.* (emphasis added). The ruling then directs administrative adjudicators to "explore other sources of documentation" including "family members, friends, and former employers" who may be able to "furnish additional evidence regarding the course of the individual's condition." *Id.*, at \*3. "The available medical evidence should be considered in view of the nature of the impairment (*i.e.,* what medical presumptions can reasonably be made about the course of the condition)." *Id.* Finally, when an inference must be made, the ruling further directs:

> [T]he administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

*Id.*

B.    *Interpretive Jurisprudence*

A federal district court aptly described SSR 83-20 as imposing "what might fairly be called heightened record-development duties." *Godsey v. Astrue*, No. 08–410–P–S, 2009 WL 1873528, at \*3 (D. Me. June 29, 2009). In that respect, courts routinely observe that neither objective nor contemporaneous medical evidence is essential to resolving the onset date of an individual's disability. In this regard, one court has observed:

> Nowhere in [SSR 83–20] is there any suggestion that the absence of medical records establishing an onset date is fatal to an individual's disability claim. In fact, the Ruling provides just the opposite, specifically noting that in some cases it may be necessary to infer the onset date of a claimant's disability from non-medical evidence.

*Moriarty v. Astrue*, No. 07–cv–342–SM, 2008 WL 4104139 at \*6 (D.N.H. Aug. 28, 2008); *see also Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (noting that dearth of contemporaneous evidence does not necessarily preclude claimant's

entitlement to a period of disability); *Parmenter v. Astrue*, No. 08–CV–1132, 2010 WL 2884866, at *4 (N.D.N.Y. Apr. 23, 2010), *report adopted in relevant part by*, 2010 WL 2803418 (N.D.N.Y. July 15, 2010) (administrative law judge erred in "adopt[ing] the position that Plaintiff was required to produce documents definitively demonstrating that his mental impairments were disabling" during the period between the alleged disability onset date and the date the administrative law judge found the claimant disabled).

Similarly, another district court in the Second Circuit held that, under latitude granted by SSR 83–20, absence of contemporaneous medical records does not preclude a finding of disability:

> There . . . are no contemporaneous records which can establish that [the claimant] was disabled as of May 15, 1999. The absence of these records, however, does not preclude her from otherwise demonstrating th[at] she was disabled as of that date. Social Security Ruling ... 83–20 provides instructions for the determination of disability onset date in such circumstances when the date needs to be inferred.

*Miller v. Astrue*, No. 03 Civ.2072(LAP)(FM), 2008 WL 2540750, at *10 (S.D.N.Y. Jun. 23, 2008).

When objective medical evidence is lacking or ambiguous regarding an onset date, several courts consider additional evidence from a medical advisor to be "essential." *See Kelly v. Astrue*, No. 06–168–P–S, 2007 WL 2021923, at *7 (D. Me. Jul. 11, 2007) (citing *Katt v. Astrue*, No. 05–55043, 2007 WL 815418, at *1 (9th Cir. Mar. 14, 2007) ("[A]n ALJ must call a medical expert if there is ambiguity in the record regarding the onset date of a claimant's disability. If the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83–20 requires the administrative law judge to call upon

the services of a medical advisor ....") (citation and internal quotation marks omitted). In *Grebenick v. Chater*, 121 F.3d 1193, 1200–01 (8th Cir. 1997), the Eighth Circuit stated the requirement explicitly:

> [W]hen there is no contemporaneous medical documentation, we ask whether the evidence is ambiguous regarding the *possibility* that the onset of her disability occurred before the expiration of her insured status. If the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83–20 *requires* the ALJ to call upon the services of a medical advisor to insure that the determination of onset is based upon a legitimate medical basis.

*Id.* (emphasis added; citations and internal quotation marks omitted). Another federal appeals court describes SSR 83-20's medical advisor requirement as "merely a variation on the most pervasive theme in administrative law-that substantial evidence support an agency's decisions." *Bailey v. Chater*, 68 F.3d 79, 80 (4th Cir. 1995).[17]

## C.    *Application*

The evidentiary hearing conducted by ALJ Patane occurred approximately *thirty years* beyond the date of the period under review, thus creating obvious problems in terms of finding and obtaining relevant medical records centering around Devizzio's childhood prior to his twenty-second birthday. Clearly, this was an instance in which it was necessary to make reasonable inferences regarding an onset date from medical and other evidentiary sources describing the longitudinal history and symptomology of Devizzio's impairments.

---

[17]     *See also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005) ("The ALJ acknowledged that the medical evidence was inconclusive. Rather than explore other sources of evidence, as SSR 83-20 requires, the ALJ [improperly] drew a negative inference at that point.").

ALJ Patane received evidence from two acceptable medical sources who expressed retrospective opinions regarding Devizzio's condition during the period at issue. Lawrence H. Fein, M.D., an orthopedic specialist currently treating Devizzio, provided a letter listing Devizzio's childhood diagnoses of orthopedic abnormalities and corrective surgeries. Dr. Fein opined:

> Because of this, *he has always been quite disabled* using, at some point, one cane and then going to crutches. . . . I feel he is disabled due to this condition, which he has had since the age of 2, and has gradually caused more and more repercussions.

(T. 445) (emphasis added). Similarly, Paul Gebhard, M.D., Devizzio's current primary care physician provided a retrospective comment that Devizzio "has been at a diminished capacity his whole life and prior to the age of 22." (T. 536). ALJ Patane, however, dismissed Dr. Fein's assessment of Devizzio's childhood condition because he "did not treat the claimant at that time" (T. 31-32), and disregarded Dr. Gebhard's opinion because Dr. Gebhard did not possess documents relating to Devizzio prior to age twenty-two. (T. 32).

ALJ Patane also considered Devizzio's testimony that, as a child, he had two foot surgeries and two hip surgeries. (T. 63-65). Devizzio stated that over the years he had to wear different casts, orthopedic shoes, and use canes and braces. (T. 60-63). Devizzio testified that he has always had trouble with prolonged standing and walking, and especially climbing stairs. (T. 60-61, 65-66). He had issues with pain quite often and throughout his childhood. (T. 65-66). While attending school, it took him longer to get to his classes, and he performed poorly in gym class. (T. 57).

ALJ Patane also looked at lay testimony of Jean Ventre, the mother of one of Devizzio's high school friends. Ms. Ventre testified that Devizzio then lived 10 or 12 blocks away. (T. 84). He did not play ball or run. (T. 84). He seemed stiff and could not manipulate himself physically as well as her son. (T. 82-83). She did not remember him using crutches or a cane. (T. 82). He did play the violin; however (T. 80), and she thought he rode his bicycle. (T. 81).

ALJ Patane also reviewed affidavits from three longtime family friends who described their recollections of Devizzio's childhood medical treatment, special shoes, casts, braces, crutches and canes.[18] Each opined that "after treatment Nicholas could not walk or run for a great distance without having to limp." ALJ Patane acknowledged that those affidavits supported Devizzio's credibility, but dismissed them by stating "these statements cannot take the place of medically acceptable medical evidence." (T. 30).

Sounding that same theme, ALJ Patane summed up his rejection of all subjective, lay and retrospective medical evidence as follows:

> [T]he claimant may have undergone the procedures detailed in his testimony and described by his current treating sources. Diagnoses may have been made, examinations conducted, laboratory tests run, and imaging studies obtained, but *absent that evidence, . . .* [h]e has not shown the presence of a "severe" medical impairment or combination of non-severe medical impairments which began at any point prior to age twenty-two, lasted for at least twelve consecutive months, and caused more than a minimal impact on his ability to engage in work related activities.

(T. 32) (emphasis added).

---

[18]    *See* Administrative Hearing Exhibits 15E, 16E and 17E. (T. 266-68, 269-71, 272-74).

ALJ Patane thus failed to follow the framework prescribed in SSR 83–20. He relied too heavily on absence of objective medical evidence from the alleged disability period, and he declined making reasonable inferences based on relevant evidence from other sources, specifically current medical sources, subjective testimony and lay testimony from childhood acquaintances. His singular focus on lack of medical evidence from the insured period does not comply with the spirit or letter of SSR 83-20. *See Arnone*, 882 F.2d at 39; *see also Parmenter*, 2010 WL 2884866, at \*4.

This was an instance in which evidence regarding the onset date of Devizzio's disability was ambiguous. Thus, SSR 83-20 required ALJ Patane to consult a medical advisor to assist in inferring an onset date. A medical advisor with both programmatic and medical expertise could review the longitudinal medical record, hearing testimony, and lay evidence and make a reasonable, professionally-informed inference as to whether Devizzio, prior to age twenty-two, had a severe impairment, whether it was presumptively disabling under the Commissioner's "Listings,"[19] and, if not, provide an opinion regarding Devizzio's "residual functional capacity"[20] prior to 1982 when he reached the maximum age of twenty-two.

In an almost identical case, a court within this circuit determined that an administrative law judge's failure to call a medical advisor required remand. *See*

---

[19]    The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B (the "Listings"). Listed impairments are presumptively disabling.  See 20 C.F.R. § 416.924(d)(1).

[20]    "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain*. See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at \*2 (July 2, 1996).

*Plumley*, 2010 WL 520271, at \*14.  There, a claimant, born in 1959, applied for and was granted supplemental security income benefits commencing in June, 1998.  Eight years later in 2006, she  applied for adult child's disability benefits, alleging an onset date beginning much earlier on January 1, 1980.  At Step 2 of sequential evaluation, an administrative law judge found that she did not have any impairment that was severe during the relevant period in part because there was no *medical evidence* allowing an assessment of the claimant's psychological state *during the relevant period* (over twenty-five years from the date of the period under review ant the evidentiary hearing).  *Id.* at \*7-8.

The reviewing court thoroughly reviewed SSR 83-20, and surveyed decisions from around the country uniformly holding that evidence other than contemporaneous medical records can support an onset-of-disability finding in similar circumstances.  Specifically, retrospective diagnoses, uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to a claimed period of disability, can support such a finding.  The court further concluded that in that circumstance, a reasonable inference of an onset date as mandated by SSR 83-20 was not possible without assistance of a medical expert.  It therefore remanded the action with instructions to follow SSR 83-20 and call a medical advisor to assist in inferring an onset date.

While *Plumley* is not binding here, its reasoning is persuasive.  For the same reasons articulated in *Plumley*, ALJ Patane inadvertently failed to apply correct principles of law when evaluating relevant evidence, and erred in not calling a medical advisor to assist in inferring an onset date.

# VII.  Harmless Error

Congress directs courts reviewing administrative agency action to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights"). This mandate refers to what modern jurisprudence calls "harmless error doctrine." *See Shinseki v. Sanders*, 556 U.S. 396, 406–08 (2009). Under this doctrine, a reviewing court must reverse and remand when an administrative law judge errs unless, as a matter of law, the result was not affected by the error. *See NLRB v. Enterprise Assoc*, 429 U.S. 507, 522 n. 9 (1977). In other words, administrative legal error is harmless when a reviewing court confidently concludes that the same result would have been reached had the error not occurred. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

Here, a reviewing court cannot conclude that the same result would have occurred absent the error identified in the preceding section. ALJ Patane may well have found that Devizzio's impairments were severe, i.e., more than minimally affecting his ability to perform basic work activities, had he considered himself free to base a Step 2 finding on evidence other than contemporaneous medical diagnoses. And, since ALJ Patane did not proceed to evaluate Devizzio's claim beyond Step 2, a reviewing court cannot consider his Step 2 error inconsequential. Hence, remand is appropriate.

## VIII.  Conclusion and Recommendation

Devizzio's *pro se* arguments do not warrant reversal of the Commissioner's decision.   A "searching investigation" of the type required of reviewing courts in this circuit, however, discloses a latent and inadvertent error that deprived Devizzio of a full and fair hearing in accordance with the beneficent purposes of the Social Security Act.

Therefore, the Commissioner's decision should be REVERSED, and the case should be REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, with instructions to verify that Devizzio was found to be disabled in 1995, and, if so, to follow SSR 83-20 in determining whether his disability commenced at an earlier date before he reached the age of twenty-two.   In that regard, the Commissioner should be instructed to enlist services of a medical advisor to assist in inferring an onset date.   Upon remand, the Commissioner should be free to explore other sources of documentation, including any additional evidence tendered by Devizzio to the court in his previously-proffered "Motion to Submit New Relevant Evidence."

## IX.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d

566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the   21   day of    April    2015.

*Earl S. Hines*

Earl S. Hines
United States Magistrate Judge